## Case No. 3,208.
### COPELAND v. BURTIS et al.
[13 Pittsb. Leg. J. 244.]
Circuit Court, W. D. Pennsylvania. Nov. Term, 1865.

ANNULMENT OF CONVEYANCE PROCURED BY FRAUD.

Deed declared void because procured by fraud practised upon the grantor.

Bill in equity to obtain the surrender and cancellation of a deed.

Purviance, Lucas & Linn, for complainant.
Foster, Corbett & Kerr, for respondent.

McCANDLESS, District Judge. The complainant in January, 1865, was the owner of a tract of land on Piehole creek, Venango county, Pennsylvania. It adjoined a tract called the "Hohnden Farm," on which a well had been sunk called the "United States Well," which on the ninth of January commenced to flow with oil to a large amount. Its value was estimated not in thousands, but in millions.

Previous to this twice the enormous wealth which had been suddenly accumulated by those who by good fortune or by good judgment had become the owners of the best oil producing lands, had caused a fever of speculation to spread through the country and among all classes of society. The rich desired to become richer and the poor to become suddenly rich. Of course there was no want of persons willing to turn the mania to their own profit and speculation of the credulity or folly of others. Every tract of land whose surface was worthless was presumed to contain hidden treasures beneath it, and was seized for the purpose of an oil stock company boasting of a capital of hundreds of thousands, divided into infinitesimal shares, to tempt even the poor to waste their hard earnings in these new schemes to obtain sudden wealth.

Nine-tenths of these stock companies were mere bubbles, supported for a time by reports from agents, who were daily expecting to strike oil. But the stockholders finding themselves only called on to pay assessments on their stocks instead of receiving dividends from profits, began at last to open their eyes. Consequently there was a sudden collapse in the market of such commodities. The good and the bad suffered equally in the public estimation, while the real value of each remained the same. The success of the United States well demonstrated the great value of the lands on Piehole creek. There was every reason to calculate that the Copeland tract would yield as great profits as the Hohnden tract, which it adjoined. The value of it therefore was not merely speculative or uncertain, depending on the panics of the stock market. It had not been converted into stock to be tossed up by bulls or trampled down by bears.

In the first stage of this transaction Copeland acted with discretion and with judgment. If he had continued to do so we should not have heard of this controversy. Instead of attempting to manage the sale of his farm himself, he put it into the hands of Mr. Bell, who was a sort of broker or agent in conducting the sales of oil lands. He offered him two per cent. on the sum he should obtain for the tract, which was very judicious. Mr. Bell contracted with the defendant Burtis, for the sale of the land for the sum of $300,000.

Previous to the execution by Copeland and wife of the agreement with Burtis on the twenty-first of January, one Rugg had obtained an interest in the tract of one-eighth, which Copeland was instructed by his agent to have released or adjusted.

Rugg, who had before promised to release for the sum of $8,000, demanded $40,000 after the success of the United States well was known, and Copeland in order to get rid of his claim was compelled to give him his judgment notes for the sum of $40,000, which would be a valuation of the whole $320,000.

By the terms of the article of agreement Burtis, besides the $10,000 paid in cash, covenanted to pay $30,000 on the first of March and $60,000 on the first of April, $100,000 in three months after that date and $100,000 in six months. These payments he had expected to make by the assistance of capitalists in New York, or the formation of another stock company. His negotiations there for this purpose failed, owing to the panic in the stock market, which soon after commenced, and the consequent distrust of all schemes of speculation in such investments by which so many had suffered.

He was therefore unable to make the payments which became due on his contract. In order to get clear of his covenants and to save his $10,000, he, with the assistance of a friend, Albert G. Morey, obtained from the complainant the deed on the third of April to Morey for the one-third of the consideration which he (Burtis) was bound by his covenant to pay. This deed of the third of April, 1865, forms the subject matter of this controversy.

The complainant alleges that it was obtained from him by false and fraudulent representations made by the respondents.

According to the new rule of evidence supposed to have been made by congress in a proviso to a section in a revenue bill, the parties were each examined as witnesses—Copeland and wife for complainants and Burtis and Morey for respondents. The only third and disinterested witness present was Odell, whose testimony confirms that of complainants.

It is unnecessary to refer to books or cases as to the principle of equity which should govern this case. The only question will be, was the complainant, who had sold his land for three hundred thousand dollars, induced to execute this deed for the same to one of the defendants by false and fraudulent representations? If such be found to be the fact, there can be no doubt as to the duty of the court.

Without noticing the discrepancies between the testimony and sworn answers of the respondents or those of the numerous witnesses examined in the case, we shall proceed to state the facts as we find them.

1. The complainant Copeland though perfectly competent to manage his little farm to sell and buy his cattle and other like transactions of persons in his situation of life, was a man of dull capacity, ignorant, incapable of apprehending the importance or effect of formal legal instruments when read over to him. He was wholly unfit to transact business of such magnitude without the assistance and advice of friends of capacity much superior to his own. His character and capacity for such business are correctly stated by the respondents. When Burtis was in New York trying to negotiate a sale of the property for $400,000 he stated to a witness who inquired of his success, "Not so well as I expected." They had the meeting, the result of which was not satisfactory; but he said they had come to the conclusion to carry out the programme, which he thought would work. The programme was this: Burtis and Mason, and his other friends, were going to Titusville. He there would meet a friend of his whom he wanted to connect with him. His friend was west somewhere—he was not in New York. That they were going to take $75,000, and go to the party from whom he had bought for $300,000, and spread it out before him and induce him to accept of the $75,000 for the purchase money, in payment of the property. That if he would not accept of the $75,000, they would go as high as $100,000—that would be the outside figure.

Then the witness remarked that he did not think it could be done. He replied, "he could for this reason : that the parties he was dealing with were old, unacquainted with doing business, unused to handling money only in small quantities, and that $75,000 spread out before them, would be a great temptation for them to accept, and that he was confident that they would not let the money go away." Witness replied that he might succeed, but they were different from any people he had ever met on the creek if he did. Burtis said that they would sign any paper that he wanted—that he was in their confidence to that extent that they would do anything he said.

Afterwards when the respondents were endeavoring to persuade or frighten Rugg with a compromise of his judgment of $30,000 which they threatened to contest—they stated that they did not consider Copeland a man capable of doing such business as Rugg's claim related to. They thought that he could be got to sign one paper as well as another—that it would be an easy matter to

defraud him. We have thus from the respondents' own mouths, a true statement of the business capacity of the party they were about to deal with.

When Burtis returns from New York his friend Morey is there, and had been examining the oil country; he agrees to advance money if they could get the farm for $100,000. Accordingly without any previous consultation, or consent of Copeland and his wife (who is rather the shrewder of the two), without any application to their agent Bell, who has acted for them in the sale of January twenty-first, they proceed to draw up writings which the complainant and wife were to be persuaded to execute on the terms dictated by the purchasers.

The article of agreement made with Copeland in January is assigned by Burtis to Morey. Copeland is asked to cancel it, but the deed to Morey is drawn for the consideration of $300,000. A mortgage is drawn to Copeland for $50,000, payable in five years, with interest payable yearly. But this mortgage is unaccompanied with any bond, or personal security, for either principal or interest. The condition of the mortgage is that "If Morey should pay the sum of $50,000 and interest thereon as aforesaid, within five years from this date."

It is not expected that the oil is inexhaustible or will run forever. If it should fail within the six years, the vendee might surrender the farm, dug into holes and worthless, after receiving millions of dollars for the oil, taken from it.

As might be expected when the terms are prepared by one party, without consulting the others, Burtis who was bound to pay sixty thousand dollars on the first of April, and who had failed to pay thirty thousand in March, was not only to be released from his contract, but was to get back his ten thousand dollars paid to bind the first bargain. The judgment of Rugg, for which Copeland was personally liable, and which would have been paid except for the default of Burtis, was wholly unprovided for. Respondents verbally promised to pay it, if with the assistance of Copeland, they could not get clear of it, and if so, they were to give Copeland something "handsome."

The deed prepared is drawn with general warranty, without any mention of the previous leases made by the vender of small portions, so that the letter of the warranty was broken as soon as it was signed.

Now without adverting to the scheme entertained by defendants of using this judgment of Rugg to compel a judicial sale of the land for the purpose of defeating the mortgage given complainants, let us examine the means used to persuade or compel him to sign this deed, for the inadequate compensation thus offered.

On the third of April, Burtis goes to the house of complainant, and tells him of the great fall of fancy oil stock in the stock market of New York, and that consequently the lands on Piehole creek would be unsaleable and had lost their value; that Morey was ready to give him $100,000; that unless this sum was accepted immediately Morey would return the next day to Chicago; that Rugg had declared his intention to sell the land on his judgment immediately, and unless Copeland would accept his terms he would be ruined. The complainant and his wife are carried off to Burtis's office at one o'clock in the day, where the papers were prepared for their signatures. Morey brings $14,500 and spreads it on the table. Copeland wishes to consult counsel. He is told the papers are all right, had been copied from legal precedents, and that a lawyer would charge $10 for his advice. Copeland asks then to see Rugg, and see if he would not give time for the payment. Burtis said there was no time to wait—Morey would leave in the morning. Mrs. Copeland withdrew, saying she would like to see Rugg before these papers were signed; and then started out into the alley. Burtis followed, and clapped his hand on her shoulder and said for God's sake to call Mr. Copeland and have these papers signed or you will lose all your land.

Having thus got the signatures of Copeland and wife to this deed, they were told that the vendor had to pay the necessary stamps, and as the consideration stated in the deed was $300,000, $300 were taken from his money to pay for them.

Thus the complainants, instead of $290,000 which they were entitled to receive on their sale of January before the execution of a deed, were prevailed on to sign a conveyance to Morey for the sum of $10,000 and a mortgage for $50,000, payable in five years, for property worth at least half a million. In a few days after the transaction the complainant's dull perceptions began to perceive that he had been imposed upon and been defrauded. His friends advised him to refuse possession and to consult counsel. But he was forcibly put out of possession and his bill was then immediately filed.

It is sufficient to say that the statements with regard to Rugg were utterly false, and that the representations as to the fall of fancy oil stocks in the New York market, though true, were used to deceive an ignorant man, by leading him to infer that the good oil lands on Piehole had depreciated in value. There were no written contracts entered into by the respondents as to the share Burtis was to have in the speculation. To a remark made by a witness to Burtis on the same day "that he had made eighty thousand dollars," he replied, "If I don't make double that I will wonder."

A few days afterwards the respondents say it was understood that Burtis was to have half for $50,000, and some days after that Burtis was to pay his $50,000 by a transfer of one-fourth of his half to Morey

for the same amount. Thus Burtis was to have three-eights for his ten thousand paid to Copeland, and Morey five-eighths for his advance of the same sum, thus valuing the speculation at $100,000 though subject to the Rugg judgment and the mortgage. Rugg has neither been paid nor as yet defrauded out of his claim.

It is not worth while to characterize by any epithets this transaction, by which a debt of $290.000 has been paid by $10,000, and a verbal promise to pay the judgment for which Copeland is still liable, and a mortgage on land which in five or six years may be utterly worthless, after it is exhausted of mineral wealth worth millions.

Suffice to say the deed of the third of April has been procured by gross fraud, and ought to be set aside and annulled.

The complainants are entitled to a decree according to the prayer of the bill.